[Cite as *In re J.A.*, 2022-Ohio-1132.]

**IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
HANCOCK COUNTY**

IN RE:

    J.A.,

DEPENDENT CHILD.

[BRANDY F. - APPELLANT]
[JAMES A. - APPELLANT]

CASE NO. 5-21-20

**O P I N I O N**

**Appeal from Hancock County Common Pleas Court
Juvenile Division
Trial Court No. 20193033**

**Judgment Affirmed**

**Date of Decision:  April 4, 2022**

**APPEARANCES:**

    *Laurel A. Kendall* **for Appellant James A.**

    *Linda Gabriele* **for Appellant Brandy F.**

    *Justin J. Kahle* **for Appellee**

**WILLAMOWSKI, J.**

**{¶1}** Appellants Brandy F. ("Brandy") and James A. ("James") bring this appeal from the judgment of the Court of Common Pleas of Hancock County, Juvenile Division, granting the motion of the Hancock County Job and Family Services, Children Protective Services Unit ("the Agency") for permanent custody of the minor child, J.A. On appeal, appellants argue that the judgment of the trial court was not supported by sufficient evidence and was against the manifest weight of the evidence. For the reasons set forth below, the judgment is affirmed.

**{¶2}** Brandy and James are the parents of J.A., who was born in 2017. Doc. 1. On April 1, 2019, Brandy and J.A. were taking a Greyhound bus to Michigan when the driver stopped the bus and notified the police regarding a domestic violence issue. Doc. 1. Brandy reportedly struck J.A. in the face multiple times after he threw her cellphone causing it to break. Doc. 1. Upon the arrival at the rest stop where the bus had stopped, Sergeant Justin Powell observed the child with blood on his nose, mouth, and shirt. Doc. 1. Brandy was arrested for domestic violence and J.A. was taken into the emergency custody of the Agency as there was no one in Ohio with whom J.A. could be placed. Doc. 1. The Agency filed a complaint alleging that J.A. was a neglected, abused, and dependent child. Doc. 1.

Notice of the hearing for James was provided by publication in the Findlay Courier as his address was not known the Agency.[1] Doc. 5.

{¶3} On April 9, 2019, the trial court granted emergency temporary custody of J.A. to the Agency. Doc. 12. Neither Brandy nor James were at the hearing. Doc. 12. The trial court also appointed Erika Long ("Long") as the Guardian ad Litem for J.A. on that same day. Doc. 11. On May 9, 2019, the Agency filed a case plan. Doc. 16. Although the case plan set forth goals for J.A. and visitation, it had no specific goals for Brandy, other than she comply with the case plan. Doc. 16. No mention of James was in the case plan. Doc. 16. On May 23, 2019, the trial court held a hearing for the purpose of adjudication. Doc. 19. Neither Brandy nor James were present, though legal counsel for both were present. Doc. 19. Following the hearing, the trial court found J.A. to be an abused, neglected, and dependent child. Doc. 19.

{¶4} On June 3, 2019, Long filed her report and recommendation, which noted that she had been unable to reach Brandy and that she had heard conflicting stories about what Brandy wanted to do. Doc. 17. Long stated that she had heard Brandy wanted to come back to Ohio to reunify with J.A. and also that Brandy did not wish to reunify with J.A. Doc. 17 at 4. No discussion regarding James was in

---

[1] Notice was not received through publication as James lived out of state at the time, which was known by the Agency. James learned of J.A. being in the custody of the Agency after he contacted Brandy's mother at the beginning of May 2019 to find out why they had not contacted him after they moved to Michigan. James then contacted the Agency to let the caseworker know that he wanted J.A. to be released to his care. Exhibit A.

the report. Doc. 17. A hearing for the purpose of disposition was held on June 6, 2019. Doc. 20. Again, neither Brandy nor James were present. Doc. 20. The trial court awarded temporary custody of J.A. to the Agency. Doc. 20.

{¶5} On September 18, 2019, a review hearing was held. Doc. 23. Prior to the hearing, Long filed her report and recommendations. Doc. 24. Long noted that J.A. was in his fourth foster home since entering the Agency's custody on April 1, 2019. Doc. 24 at 1-2. Long noted that the Agency was requesting a home study on J.A.'s maternal grandfather, but she indicated she had not had any contact with the man. Doc. 24 at 2. She also noted that Brandy had not come to any visits since the removal and that James was "reportedly living down south and has had no contact with [J.A.] during the case." Doc. 24 at 2. Long did not indicate that she had attempted to establish contact with either Brandy or James. Long recommended that any visits Brandy had with J.A. be supervised and that he remain in the custody of the Agency. Doc. 24 at 2-3. The Agency submitted a case plan which indicated that Brandy had not been able to engage in services because she lived out of state. Doc. 25. The review made no mention of James. Neither Brandy nor James were present for the hearing. Doc. 26. The trial court ordered that the custody remain with the Agency. Doc. 26.

{¶6} On February 19, 2020, the Agency filed a motion for permanent custody. Doc. 35. The motion alleged that J.A. could not be placed with either of his parents because the parents 1) failed to remedy the conditions causing the child

to be placed outside the home, 2) chemical dependency, and 3) lack of commitment. Doc. 35. The Agency filed a review of the case plan showing that Brandy had made insufficient progress on the case plan as she had not engaged in services. Doc. 37. Notably, no recommendations were made as to James as he was not listed on the case plan other than as the biological father on the SAR participants page. Doc. 37. The review did indicate that neither Brandy nor James had visited with J.A. since he entered the custody of the Agency.[2] Doc. 37. The review indicated that James was in compliance with the court orders at that time even though it also stated that he was not on the case plan for services. Doc. 37.

{¶7} On March 10, 2020, Long filed her report and recommendations for the review hearing. Doc. 44. Long recommended that J.A. remain in the temporary custody of the Agency. Doc. 44. The trial court then set the hearing for the motion for permanent custody for August 24-25, 2020. Doc 50. On June 2, 2020, a motion for joinder and placement of J.A. was filed by Brandy's Cousin, Jovita ("Jovita") and, in the alternative, J.A.'s paternal grandmother, Vanessa ("Vanessa"). Doc. 61. On June 19, 2020, the Agency filed a motion for approval of an amended case plan. Doc. 65. J.A. was again moved to a new foster placement. Doc. 65. The new plan did not add James to the plan and did not list him as an approved visitor. Doc. 65.

---

[2] A review of the record shows that James was not listed as one who could visit J.A. in the original case plan. Doc. 16. James was not added to the case plan as a participant before the February 18, 2020 review. Doc. 37. That review indicated several times that James had not visited with J.A., however he still was not added to the case plan as one who could visit with J.A.

Unlike on the reviews, James was not listed as a participant on this plan. Doc. 65. The Agency filed a motion for paternity testing on June 19, 2020. Doc. 66. The trial court granted the motion for a paternity test on June 25, 2020. Doc. 67. On August 24, 2020, the Agency filed a motion to have James designated as the biological father of J.A. Doc. 82.

{¶8} On July 13, 2020, James filed a motion for placement of J.A. with Vanessa and requested that the Agency initiate a request for a home study in North Carolina where Vanessa resides. Doc. 70. Due to this motion being filed, the Agency requested a continuance on the permanent custody hearing. Doc. 78. A second continuance was requested by the Agency to allow time for the home study from North Carolina to be completed. Doc. 92. This motion was denied by the trial court. Doc. 93. Based upon this denial, the Agency filed a motion to withdraw its motion for permanent custody and to instead have a six-month extension of temporary custody. Doc. 95. The trial court granted the motion for an extension and dismissed the motion for permanent custody. Doc. 96.

{¶9} On January 27, 2021, the Agency filed a motion for approval of an amended case plan. Doc. 103. The new case plan included James and required him to "cooperate with all requirements of ICPC and all services as outlined in this concern. He will sign all releases of information and stay in direct communication via email or phone with the [Agency]." Doc. 103. This plan was developed with

the approval of James and signed by him. Doc. 103. Brandy did not agree to the plan because they were unable to locate her. Doc. 103.

{¶10} Four days later, on February 1, 2021, the Agency filed a second motion for permanent custody. Doc. 106. James filed a motion for custody on March 15, 2021. Doc. 135. A hearing on both motions was held on May 10-11, 2021. Doc. 170-71. During the hearing, the following evidence was presented.

{¶11} Morgan Lemons ("Lemons") testified that she was employed as a case manager for Harmony House and she supervised the visitation facility. Tr. 11. As part of her job, Lemons indicated that she writes the monthly progress reports, though she does not monitor the visits. Tr. 12-13. Lemons testified that she received the referral for both Brandy and James from the Agency on November 30, 2020. Tr. 18. James contacted her on December 7, 2020 and completed his intake on December 14, 2020. Tr. 18. Brandy made contact on December 17, 2020, but did not complete her intake until February 22, 2021. Tr. 18. Lemons indicated that she learned of a problem in one of the March 2021 visits and reviewed the video. Tr. 15. In the visit, J.A. appeared uncomfortable with Brandy, but hugged James. Tr. 15. When they would play, J.A. would back up towards James and away from Brandy. Tr. 16. When Brandy picked J.A. up, and spun him around, J.A. punched Brandy in the face. Tr. 16. Brandy then put J.A. down and laid on the ground. Tr. 16. J.A. then started to strike Brandy's back with his hands and feet. Tr. 16. James told J.A. that they had to go and not to harm Brandy. Tr. 16. Although James did

not physically intervene with J.A.'s assault on Brandy, he did attempt to redirect J.A. and took away the bigger toys from J.A. so that he could not throw them at Brandy. Tr. 21, 26. However, at the end of the visit in April 2021, J.A. hugged both Brandy and James after a successful visit where they all played and talked. Tr. 20. Additionally, Lemons testified that she saw no issues with James' parenting skills. Tr. 26.

{¶12} Nicole Bash ("Bash") testified that she is the foster mother of J.A. Tr. 28. J.A. was moved into their home on June 10, 2020. Ex. 8. Bash indicated that J.A. calls her mom and her husband dad and that they are all very bonded to each other. When J.A. arrived at the home, he had behavioral issues and threw tantrums.[3] Tr. 31. Bash testified that J.A. had no strong behavioral issues until he started visiting with his paternal grandmother. Tr. 32. Then J.A. would become concerned he would have to leave the Bash family and started screaming. Tr. 33. Bash eventually told the paternal grandmother to stop contacting J.A. because he was uncomfortable. Tr. 33. According to Bash, J.A. does not like change and has told Bash he wants to stay with them forever. Tr. 34-36. J.A. has been showing anxiety since he started visits with his "other mommy and daddy". Tr. 37. J.A. has started seeing a counselor to deal with his anger issues, but they are not addressing his

---

[3] J.A. would have been three at that time and had been with multiple foster placements in the year between entering the Agency's custody and being placed with the Bash family, including one which was supposed to be an adoptive placement as shown by the first motion for permanent custody and affidavit filed by the then foster parents.

anxiety. Tr. 38-39. Bash indicated that although James has visits, including regularly scheduled zoom visits, J.A. still asks if he will live with the Bash family even though his daddy has a different house. Tr. 40. However, the visits with James go well and J.A. seems to like them. Tr. 42-43. Bash testified that she and her husband would like to adopt J.A. and would be willing to continue contact with family members as long as it was healthy for J.A. Tr. 45.

{¶13} On cross-examination Bash testified that J.A. expresses his anxiety by biting his nails and fingers, though never to the point of injury. Tr. 47. Bash also testified that when J.A. was placed with them, they were told by the Agency it was a permanent placement as no family members wanted J.A. Tr. 51. As a result, Bash told him he was staying with them forever. Tr. 52. When J.A. gets upset during a zoom call with James, James tries to calm him down and J.A. is not as anxious after those visits. Tr. 56.

{¶14} Carmen Loth ("Loth") testified that she is the ongoing supervisor for the Agency. Tr. 62. The Agency became involved with this matter when Brandy was arrested for domestic violence after she struck J.A. multiple times in the face while on a bus. Tr. 64. Loth identified Ex. 7 as case plan 1. Tr.68. In the first case plan, Brandy was listed as one to whom services would be provided, but was not a participant because the Agency was unable to locate her. Tr. 69. James was not on

the case plan.[4] Ex. 7. The original caseworker[5] made monthly phone calls to Brandy, but not James. Tr. 76. Until 2021, there were no visits from Brandy or James. Tr. 77. When Loth spoke with James in 2020, James indicated he did not know if he could see J.A. because it would be too hard on "him" emotionally, which Loth took to mean too hard on James. Tr. 78. Loth testified that she offered James bus tickets or gas cards to come visit since he lived in North Carolina. Tr. 78. James did not seek to establish paternity until 2020, though the Agency wanted to establish it earlier, but did not know were to find James. Tr. 79-80. In July 2020, paternity was established and James indicated that he wanted custody of J.A. Tr. 80. The Agency ultimately added James to the case plan in December 18, 2020, when plan 1.02 was signed and later filed with the trial court. Ex. 9.

{¶15} On cross-examination Loth testified that Brandy did come to two meetings, but did not visit with J.A. Tr. 83. At one of the visits, Brandy indicated she wanted to see J.A., but due to COVID restrictions, Loth was unable to arrange the visit. Tr. 87. Although James' name was not on J.A.'s birth certificate, both Brandy and James said he was the father. Tr. 85. Loth admitted that the Agency chose not to add James to the case plan after paternity was established until James specifically asked for services so that he could obtain custody of J.A. Tr. 88. Loth also admitted that the first caseworker received an email from James in May of

[4] As James was not on the case plan, he was also not authorized to have visits with J.A.
[5] The current caseworker was the fourth one assigned to the case in the time J.A. was in custody.

2019, before the first case plan was developed, acknowledging paternity, asking how to establish paternity, and requesting custody of J.A. Tr. 89-90. According to Loth, the Agency did not contact James about adding him to the case plan because they were focusing on Brandy. Tr. 90. Loth stated that she did not know about the emails or the contacts with James until counsel showed them to her because the contact log did not contain any information about James, only Brandy. Tr. 91. Loth relied upon child support to arrange the paternity test, but did not know what, if anything, was done by that agency. Tr. 91. The paternity test was completed when the third caseworker for the Agency arranged it. Tr. 92. Loth testified that James was in compliance with the case plan and that the ICPC review recommended placement with James. Tr. 92-93. James had also completed the required global assessment inventory of needs to identify any substance abuse and mental health issues as required by the case plan. Tr. 96. No concerns were noted for James, though he did have one positive test for THC at the beginning, though the subsequent ones were all negative. Tr. 97.

{¶16} On redirect, Loth testified that she did not know why there was a delay in adding James to the case plan. Tr. 94. When asked why the Agency was not moving forward with placing J.A. with James, Loth said it was because the Agency had already filed for permanent custody, J.A. had been in foster care for an extensive period of time, and neither parent had visited him for a good portion of that time despite knowing where he was. Tr. 94.

{¶17} Kelly Miller ("Miller") testified that she was the ongoing caseworker for J.A. since the end of October 2020. Tr. 98. When Miller started neither Brandy nor James were receiving any case plan services and neither plan had services for either parent listed until December 17, 2020. Tr. 99-100. Miller's first contact with James was in November 3, 2020, and with Brandy in December 2020. Tr. 100. James called her to find out J.A.'s current clothing size and what toys he wanted so that he could purchase him some Christmas gifts. Tr. 100. James told Kelly that he had limited contact with J.A. because he was afraid of triggering J.A.'s separation anxiety. Tr. 102. James requested that he be permitted to visit with J.A. in late November of 2020. Tr. 102. Miller indicated to James that it would be unfair to J.A. to start up visits at that time, but eventually, she referred James and Brandy to Harmony House for visits. Tr. 103. Case plan 1.02 provided services for James, but not for Brandy. Tr. 106. James was required to complete the ICPC home review, complete the GAIN assessment, have a BCI & FBI background check, provide safe & stable housing, and have a safe plan for daycare if he got custody. Tr. 107. Miller testified that James had completed the GAIN assessment and the home review. Tr. 107. She did not know if had completed the criminal background check. Tr. 109. The home review indicated that the home was appropriate for the child to reside, that he would have his own room, and that there was adequate income to provide for J.A. Ex. G. It indicated that a relative with whom James and J.A. would be living is retired and would be providing care for J.A. while James

worked and would be there to meet J.A. after school once he started. Ex. G. The review showed that criminal background checks were completed on all members of the household. Ex. G. The background check on James indicated that he had no criminal convictions outside of traffic violations over a decade previously. Ex. G.

{¶18} Miller testified that James had a possible nine in person visits. Tr. 107. Of those he came to three, cancelled five, and the foster parents cancelled one, though the cancelled ones did occur via zoom. Tr. 107. Miller said that although the home study recommended placement with James, she could not because of the lack of visitation. Tr. 109. In her opinion, neither James nor Brandy had made significant progress with the case plan requirements. Tr. 110. As to Brandy, Miller testified that she had only attended two of the possible visits. Tr. 110. Miller indicated that the Agency did not consider unsupervised visitation with either parent because of the lack of opportunities to observe the parents during the visits. Tr. 111-12. Miller indicated that James had requested to visit J.A. on his birthday and was permitted to have such a visit at a park supervised by the foster parents. Tr. 112. James wanted to bring Brandy and both grandmothers, but that request was denied. Tr. 112. James then cancelled the visit, stating that he felt uncomfortable having the foster parents supervising his visit with no other family member present. Tr. 112. Miller testified that James' visits went well, except for his failure to intervene in the incident during the second visit. Tr. 113. The first and third visits went very well and the staff from Harmony House indicated that during the third

visit James was appropriately redirecting J.A.. Tr. 113. Miller testified that the foster parents reported that J.A. showed anxiety after the visits and "gets extra clingy" needing reassurance from the foster parents. Tr. 114.

{¶19} As of the hearing date, Brandy had reported a new address, which was her third since December. Tr. 114. Brandy is now living with a new man and Miller knew nothing about him. Tr. 114. Brandy had told Miller that is the address she intends to keep. Tr. 114. Miller had concerns about James' address because the address on his W-9 form was his mother's home and he states he lives with his aunt and uncle in Summit, North Carolina. Tr. 108. In Miller's opinion, Brandy had abandoned J.A. and had not worked with the Agency towards reunification since the beginning. Tr. 115. Miller's opinion was that although James did engage in services in November 2020, there was not enough progress to recommend reunification. Tr. 115. Miller testified that it would be in J.A.'s best interest to be placed in the permanent custody of the Agency. Tr. 116. She describes J.A. as being very bonded with his foster parents and the other children in the home. Tr. 117.

{¶20} On cross-examination, Miller testified that Brandy had not completed the GAIN assessment. Tr. 121. Miller admitted that she was the fourth caseworker and she had not spoken with any of the prior caseworkers to discuss whether any visits had been requested. Tr. 124. She indicated that there was some documentation that a prior caseworker had attempted to set up a visit for James, but

the offered date did not work for the parties. Tr. 124. She also admitted that she did not know if James could have obtained a visit prior to paternity being established in July of 2020. Tr. 125. When Miller questioned James about his address, he indicated that he was living in Summit, North Carolina, but worked remotely for a company in Georgia. Tr. 127. Miller admitted that she had no reason to believe that James had a criminal record. Tr. 128. Although James did not do the in person visit with J.A. on his birthday, he did a zoom visit instead. Tr. 128. The zoom visits are done because James has to travel from North Carolina for each of the in person visits. Tr. 129. On redirect, Miller admitted that the only concern she has regarding James' address is that if he were living with his mother, her home study was denied. If he were living with his aunt and uncle, the Agency would not have a concern about the stable and safe housing. Tr. 131.

{¶21} Following the testimony of Miller, the Agency rested its case. Long, the GAL, then took the stand. Long testified that she had not met Brandy or James but she knew who they were. Tr. 135. She could not recall when either parent requested visits before November 2020. Tr. 136. Long has visited with J.A. 26 times over the two years he has been in the Agency's custody. Tr. 136. In the first visits, he was very timid and would "freak out over every little thing." Tr. 137. Since the beginning, J.A. has moved foster placements five times and been with four foster families. Tr. 137. The first family member to visit in person with J.A. was his paternal grandmother in October 2020, and the visit went well. Tr. 138-39.

Although J.A. clung to Bash at the beginning, he was opening up to his grandmother by the end of the visit. Tr. 138-39. Having observed J.A. in the foster home, Long testified that he was flourishing there. Tr. 139.

{¶22} On cross-examination, Long testified that she attempted to contact Brandy and James up until disposition and then she stopped. Tr. 142. She has not had any contact with them outside of contacting James' attorney. Tr. 142. She also has not observed any of the visits, but did review the video of the March visit where J.A. starting hitting and kicking Brandy. Tr. 143. Long admitted that she did not know what was causing J.A.'s behavioral issues at the beginning and they could have just been from the removal from Brandy and being placed in the foster home. Tr. 145. The changes in J.A.'s behavior could have been attributed somewhat to J.A. getting older and continuing to develop. Tr. 146. She also admitted that although she spoke with all the caseworkers about the visitation, she had not been told about the emails from James requesting a paternity test and visitation at the beginning of the case. Tr. 147. J.A.'s behavior at removal was no different from other children his age who have been removed from their homes. Tr. 148.

{¶23} James testified that he lives in Browns Summit, North Carolina and is the father of J.A. Tr. 155. He learned that J.A. had been taken into the custody of the Agency on May 5, 2019, when he called Brandy's mother to check on them. Tr.155. He then contacted Linsey Jones ("Jones") of the Agency by email as that is the information Brandy gave him once he reached her. Tr. 156. He first emailed

Jones on May 7, 2019. Tr. 156. At that time, he told Jones that he was J.A.'s father and asked what he needed to do to get custody and how to visit him. Tr. 156. He told Jones he would take the paternity test and gave her his contact information. Tr. 156-57. Jones did not get back to James about the test and the next time she told him a different caseworker would be taking over the case. In June of 2019, Isaiah Simmerman ("Simmerman") became the caseworker. Tr. 157. Simmerman told James that he was new and would have to get back to him about the paternity test. Tr. 158. Simmerman then asked him if he had any relatives he would like to place J.A. with as that would be quicker than getting J.A. placed with James. Tr. 158. He gave them his sister's name and they sent a form to her which she returned. Tr. 158. The Agency never contacted his sister choosing Brandy's father instead. Tr. 158. Simmerman never contacted him regarding the paternity test. Tr. 158. James was able to get a visit scheduled in September of 2019 right around a court hearing, but James had car troubles and was unable to make the visit or the court hearing. Tr. 158. James testified that Simmerman told him that the ICPC process would be completed before Thanksgiving. Tr. 159. According to James

> **Communication with [Simmerman], really, communication with the Agency in general is real sparse. You'll call and call, not get called back. You'll e-mail. You might get an e-mail back in three days. It might be two weeks. So [Simmerman] wasn't really responding that well so I, I contacted him again in early November of 2019, asking for an update and the status and what all I needed to do and he was like, well, we're still work, it's still processing. It might not be done, the ICPC might not be done by Thanksgiving. It should be done by Christmas. And I e-mailed**

> **him back. He didn't respond. Never heard from [Simmerman] again.**
>
> **\* \* \***
>
> **[A]s it got closer to Christmas, I bought [J.A.] a three foot My Paw Patrol tower, so I started calling the number and e-mailing [Simmerman] and not getting any response. [Loth] had said something that the caseworker should notify us when they change. We were not notified at all. \* \* \* At one point, I want to say this was after Christmas, around, like, the 29th of December I called the jobs side of Hancock County CPS. And the lady told me she would walk over because somebody should be on that side. And she walked over there, but no one was over there, so I guess she left a message. And then about four days later, like January 3rd or 4th, [Loth] and Ashley Wells [("Wells")] called me. And that was the next contact.**

Tr. 159-60. At that call, James asked Loth for an update on the ICPC and was told not to worry about it because the Agency had filed a motion for permanent custody. Tr. 160. James denied that he did not visit because of how it would affect him, but rather because he knew that having him come and go would trigger J.A.'s separation anxiety. Tr. 161. He also indicated in that call that he wanted custody of J.A. Tr. 161. Wells then contacted him the next day to attempt to arrange visits over FaceTime. Tr. 161. James testified that he also emailed Wells trying to get information as to how to set up the DNA testing for the paternity test, but there was no response. Tr. 162. When James learned in February 2020 that Brandy's father's ICPC was denied, he asked his attorney to have James added to the case plan for services. Tr. 163. On June 24, 2020, James learned from his attorney that the Agency had finally ordered the paternity test. Tr. 164. James contacted the Agency

immediately and completed the test within a week of being notified. Tr. 164. In September and October 2020, James attempted to contact Wells for an update on J.A. and the case plan and the email came back as "undeliverable". Tr. 165. James then called multiple times before finally reaching Loth. Tr. 165. That's when he learned that Miller was now the caseworker. Tr. 165. After getting the introductory email from Miller, he responded with questions. Tr. 165. Miller got back to him after a week or two. Tr. 165.

{¶24} James indicated that he had been living with his mother until she applied for kinship placement of J.A. Tr. 166. At that time the caseworker in North Carolina told him he could not be there as he was the biological parent, so James moved in with his aunt and uncle and completed a change of address. Tr. 166. The address on the W-9 form was different because he had not changed his address officially with the bank and he did not want there to be a discrepancy in information for the reimbursement. Tr. 166. James testified that he did notify the Agency when he moved to his current residence. Tr. 166. The Agency agreed to give him services in December 2020. Tr. 167. When they sent the case plan, James noted there were errors on it, such as saying that he lived in Georgia or that he was unable to emotionally cope with seeing J.A. Tr. 167. Although the case plan did not require him to take a parenting class, James voluntarily enrolled in a program certified through the state of North Carolina and identified Exhibit D as the certificate for that program. Tr. 168, 171. James identified Exhibits A and B as some of the email

correspondence between himself and the Agency and himself and his first attorney. Tr. 170-71. James indicated that since the beginning of the case he has been trying to find out how to engage in visits and establish paternity, but was never given any direct answers. Tr. 171. Once he had answers, he began doing as asked. Tr. 171. According to James, he has had safe and stable housing since November of 2020. James tried to set up visits to coincide with court hearings, but he was unable to attend the one in September 2019 due to car trouble. Tr. 175. Then he tried to schedule a visit around the February 19, 2020 hearing, but it was rescheduled to March due to a conflict with the judge's schedule. Tr. 175. The March court date was then pushed back to October because of COVID. Tr. 175. James testified that he requested to visit J.A. for his birthday in 2020, but no one got back to him. Tr. 176.

{¶25} On cross-examination James testified that after speaking with Jones in May 2019, she sent him the information for his court appointed attorney and James was first in contact with the attorney in mid May. Tr. 177. James denied ever getting any copies of court orders regarding this case, he was just being told what happened by his attorney. Tr. 178. James first found out that J.A. had been removed from Brandy's care when he could not reach Brandy for a while, so he called her mother at the beginning of May. Tr. 182. The first hearing he knew about was scheduled for May 23, 2019, which he learned about the day before. Tr. 183. James was unable to make the hearing because he was in Georgia and had no vehicle at

the time. Tr. 183. He also could not make the June 6, 2019, hearing because he lacked transportation. Tr. 183. James did not get copies of the court entries, just emails from his attorney and he claims he did not know to ask for them. Tr. 184. James testified that he pushed for a family placement at first rather than custody to him because Simmerman and his own attorney told him that would be the quickest method of getting J.A. out of foster care. Tr. 186. Although James emailed Wells about visits in February 2020, she did not get back to him until May 2020. Tr. 187. The Agency kept telling him to direct any questions to his attorney and his attorney kept telling him to ask the Agency. Tr. 187. The address on his tax return was his current one, not his mother's address. Tr. 189. James admitted that he cancelled some of the visits in the winter because of weather and the roads were too icy to drive through the mountains. Tr. 191. James claimed he did not physically intervene between J.A. and Brandy during the visit because Harmony House's rules are that you cannot touch or move a child unless the child consents. Tr. 191. James claims he asked his attorney to file for visitations many times. Tr. 192.

{¶26} On May 17, 2021, the trial court entered judgment granting the Agency's motion for permanent custody and terminating the parental rights of Brandy and James. Doc. 149. Both Brandy and James filed timely notices of appeal. Doc. 151, 162. On appeal the following assignments of error were raised.

### Brandy's First Assignment of Error

The trial court's decision is against the manifest weight of the evidence as [the Agency] did not prove by clear and convincing evidence that the Agency should be granted permanent custody of the minor child.

### Brandy's Second Assignment of Error

The trial court abused its discretion in finding that permanent custody to the Agency was in the minor child's best interest.

### James' First Assignment of Error

The trial court's finding that [James] "failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home is not supported by sufficient evidence, and/or is against the manifest weight of the evidence.

### James' Second Assignment of Error

The trial court's finding that [James] "caused the child to suffer neglect between the date of the filing of the original complaint and the date of the filing of the motion for permanent custody" is not supported by sufficient evidence, and/or is against the manifest weight of the evidence.

### James' Third Assignment of Error

The trial court's finding that [James] "demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child" is not supported by sufficient evidence, and/or is against the manifest weight of the evidence.

**James' Fourth Assignment of Error**

**The trial court's finding pursuant to R.C. 2151.414(E)(10) that [James] abandoned the child was not supported by clear and convincing evidence.**

**James' Fifth Assignment of Error**

**The trial court's finding pursuant to R.C. 2151.414(E)(14) that [James] is unwilling to provide shelter and other necessities for the child and is unwilling to prevent the child from suffering physical abuse or neglect was not supported by clear and convincing evidence.**

**James' Sixth Assignment of Error**

**The trial court abused its discretion when it terminated [James'] parental rights citing abandonment and failure to remedy the circumstances causing the removal when father's genetic testing was not arranged by the agency until July 2020, he was not added to the case plan until [December] 2020, and [James] was not involved in the incident causing the removal.**

*Sufficiency and Manifest Weight of the Evidence*

{¶27} The right to parent one's own child is a basic and essential civil right. *In re Murray*, 52 Ohio St.3d 155, 556 N.E.2d 1169 (1990). "Parents have a 'fundamental liberty interest' in the care, custody, and management of their children." *In re Leveck*, 3d Dist. No. 5–02–52, 5–02–53, 5–02–54, 2003–Ohio–1269, ¶ 6. These rights may be terminated, however, under appropriate circumstances and when all due process safeguards have been followed. *Id.* When considering a motion to terminate parental rights, the trial court must comply with

the statutory requirements set forth in R.C. 2151.414.  These requirements include,

in pertinent part, as follows.

> **(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:**
>
> **(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, \* \* \* and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**
>
> **(b) The child is abandoned.**
>
> **\* \* \***
>
> **(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period \* \* \*.**
>
> **\* \* \***
>
> **For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to [R.C. 2151.28] or the date that is sixty days after the removal of the child from the home.**
>
> **\* \* \***
>
> **(C)  In making the determination required by this section \* \* \*, a court shall not consider the effect the granting of permanent custody to the agency would have upon any parent of the child.  A**

> **written report of the guardian ad litem of the child shall be submitted to the court prior to or at the time of the hearing held pursuant to division (A) of this section * * * but shall not be submitted under oath.**
>
> **If the court grants permanent custody of a child to a movant under this division, the court, upon the request of any party, shall file a written opinion setting forth its findings of fact and conclusions of law in relation to the proceeding. The court shall not deny an agency's motion for permanent custody solely because the agency failed to implement any particular aspect of the child's case plan.**

R.C. 2151.414. A court's decision to terminate parental rights will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which a court can determine by clear and convincing evidence that the essential statutory elements for a termination of parental rights have been established. *In re S.L.*, 3d Dist. Shelby Nos. 17-17-17, 17-17-18, 17-17-19, 2018-Ohio-900, ¶ 24.

{¶28} The determination whether to grant a motion for permanent custody requires a two-step approach. *In re L.W.*, 3d Dist. Marion Nos. 9-16-55, 9-16-56, 2017-Ohio-4352, ¶ 5. The first step is to determine whether any of the factors set forth in R.C. 2151.414(B)(1) apply. *Id.* If one of those circumstances applies, then the trial court must consider whether granting the motion is in the best interest of the child by considering the factors set forth in R.C. 2151.414(D). *Id.*

{¶29} Brandy claims in her first assignment of error that the trial court's granting of the Agency's motion for permanent custody was not supported by

sufficient evidence and was against the manifest weight of the evidence. A review of the record shows that J.A. was removed from Brandy's care after she struck him repeatedly in the face causing his nose to bleed. The first case plan required Brandy to "participate in the ICPC process if she remain[ed] in Michigan" or "engage in case plan services if she mov[ed] to the state of Ohio in order to reunify with [J.A.]" Exhibit 7. No explanation as to what exact services would be required was set forth in the case plan. The case plan did grant weekly visitation to Brandy with each visit being 1-2 hours. Exhibit 7. Although Brandy did make suggestions regarding potential relative placements, she did not participate in the ICPC process or utilize any of her visits for nearly two years. Tr. 77. Brandy did not even appear for meetings or hearings and would go for long periods without contacting the Agency at all. Testimony was presented that on the occasions Brandy did participate in Agency meetings, she usually did not ask to see J.A. or even ask about how he was doing. Brandy had no contact with J.A. from April 2019 until February 2021. By the time of the hearing, she had visited with J.A. two times in two years. She had not completed her GAIN assessment as required and from December 2020 until the time of the hearing, she had three different addresses. None of those addresses had been reviewed for suitability. She made no effort to do anything until December of 2020, despite having been a member on the case plan since its formation in May 2019.

{¶30} In this case, the trial court found that J.A. could not be placed with his parents within a reasonable time and that J.A. had been in the temporary custody of the agency for at least twelve of the twenty-two months preceding the filing of the motion for permanent custody. A review of the evidence shows that Brandy failed to comply with the case plan and did not remedy the problems that caused the removal of the child from the home. R.C. 2141.414(E)(1). Brandy made little to no effort to have any contact with J.A. during the time he was in the temporary custody of the Agency. R.C. 2151.414(E)(4). When determining whether a child cannot or should not be placed with a parent with a reasonable time, the court reviews the facts set forth in R.C. 2151.414(E). If the court finds by clear and convincing evidence that one of the conditions is present, "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent". R.C. 2151.414(E). The trial court found that multiple of the conditions were present. The trial court's findings were supported by the evidence as it applies to Brandy.

{¶31} Additionally, J.A. was placed in the custody of the Agency in April of 2019, with adjudication occurring on May 23, 2019. The Agency filed its motion for permanent custody in February of 2021. This means that approximately 20 full consecutive months had passed in which J.A. was in the temporary custody of the Agency. The trial court specifically found that pursuant to R.C. 2151.414(B)(1)(d)

was applicable in this case. Thus, the evidence supports the trial court's findings under R.C. 2151.414(B)(1) and (E). Brandy's first assignment of error is overruled.

**{¶32}** Like Brandy, James claims that the trial court's findings were against the manifest weight of the evidence. Since all of James' assignments of error address the same issue, just different findings, we will address them together. In his first assignment of error, James claims that the trial court erred in finding that he failed to comply with the case plan and thus remedy the conditions causing the removal of J.A. from the home. A review of the evidence shows that James had no requirements under the case plan until plan 1.02 was implemented in December 2020 as he was not listed on any case plan before then. Without listing him on the case plan, there was nothing required for him to remedy. After James was added to the case plan in December 2020, he began actively working the case plan, including completing the GAIN assessment completely and completing the ICPC review. He even went above and beyond by taking a parenting class that was neither required nor requested. The semi-annual review filed on February 19, 2020, before James was ever added to the case plan, stated that James was in compliance with court orders. Doc. 37. Loth testified that in her opinion, he was in compliance. Tr. 92-93. Once James' visits were established in January of 2021, he not only completed three in person visits, he was also engaged in weekly zoom visits. According to the testimony of Bash and Miller, missed in person visits were completed via zoom visits. Miller admitted that the only reason she was recommending permanent

custody was the visitation situation and also admitted that she did not know if he would have been permitted to visit without being listed on the case plan. Logically, it seems unfair to hold James responsible for not complying with Agency recommendations for the majority of the time J.A. was in custody when the Agency set forth no recommendations with which James could comply.

{¶33} Additionally, the cause of the removal was the domestic violence perpetuated by Brandy against J.A. when James was not present. There was no evidence presented that indicated James played any part in this condition. At the time of the final hearing, James and Brandy were no longer involved in a relationship. He was living in North Carolina with his aunt and uncle. Brandy was living in Michigan with her new boyfriend. As mentioned above, James was not even a party to any case plan until December 2020. Thus it would appear that the trial court's finding that James failed to remedy the condition causing J.A. to be removed from the home was not supported by weight of the evidence.

{¶34} James' second and third assignments of error are based on the supposition that James neglected J.A. by not visiting him and that the lack of visits showed a lack of commitment. The record shows that James did not even learn about the Agency having custody of J.A. for over a month. Although the trial court appointed counsel for James in April, service to James was done by publishing an

announcement in the Findlay, Ohio newspaper.[6] Service by publication is permitted by Civil Rule 4.4 but it requires that the party seeking service by publication file an affidavit with the court showing "that service of summons cannot be made because the residence of the party to be served is unknown to the affiant, *all of the efforts made on behalf of the party to ascertain the residence of the party to be served*, and that the residence of the party to be served cannot be ascertained with reasonable diligence. Civ.R. 4.4 (emphasis added). The Agency's affidavit in this case failed to state any of the efforts made to ascertain James' address. Doc. 5. Instead it merely requested service by publication "because his address is unknown to Affiant and cannot be ascertained with reasonable diligence." Doc. 5. This does not comply with the civil rule. Thus no notice was actually received until May 2019 when James first spoke to Brandy.

{¶35} Once James had notice, the undisputed testimony, supported by the emails, was that he asked what needed to be done to establish paternity and get J.A. Loth testified that she assumed child support would take care of it. James testified that the caseworker told him to speak with his attorney and that his attorney told him to speak with the Agency. James testified that he did not know how to go about getting the test. The record contains numerous claims about what could have happened, but what did happen was that on April 2, 2019, the trial court issued an

---

[6] This is permitted by Civ.R. 4.4 even though James lived out of state and was highly unlikely to receive actual notice from such a publication which the Agency knew.

order requiring the parents of J.A. report for DNA testing on May 7, 2019. Doc. 3. The order only shows service on the Agency. Doc. 3. The notice of publication only mentions the hearing on May 9, 2019. Doc. 5. Counsel was appointed for James on April 4, 2019, even though he was only the presumptive father and no one knew how to contact him at that time. Doc. 9. Nevertheless, a motion for a paternity test was finally filed by the Agency in June 2020.

{¶36} Paternity was established in July with the Agency acknowledging it in August. However, even after it was established, the Agency made no attempt to modify the case plan to finally incorporate James into it. Instead, the Agency waited until James specifically told him he wanted services. Until December 2020, James was not listed on any case plan that would have provided visitation and the caseworker testified that she did not know if he would have even been permitted to visit before paternity was established. There was evidence from James that Simmerman agreed to arrange a visitation before a court hearing in September 2019, but it failed to happen when James had car trouble and was unable to come to Ohio for the hearing. James also testified that the Agency also agreed to allow him a visit before a hearing in March 2020. However that hearing and visit were cancelled due to COVID protocols being implemented. There is no doubt that James should have pushed the issue of visitation through his counsel. There is also no doubt that the Agency was not doing anything to encourage James to visit either. The testimony of the caseworker, of the supervisor, and of James seems to show that everyone was

just waiting for someone else to do something. The evidence does not show that James was ignoring his child or did not wish to see him. Thus, the finding that James was a cause of neglect or lacked commitment to his child was not supported by clear and convincing evidence.

{¶37} In his fifth assignment of error, James claims the trial court erred by finding that he was unwilling to provide shelter for the child. The evidence was that once the Agency added James to the case plan, he began to obtain the home study to evaluate the propriety of his home. The ICPC was completed and recommended that J.A. be placed with James. This does not show by clear and convincing evidence that he was unwilling to care for or to provide shelter for J.A.

{¶38} James argues in the fourth assignment of error that the trial court erred by determining that he had abandoned J.A. A child is presumed abandoned if a parent fails to visit or maintain contact with the child for a period of 90 days even if the parent subsequently resumes contact. R.C. 2151.011(C). Even if this court does not count the time that James was not authorized by the case plan to contact J.A. and only considers the period of time from when the paternity test established James as the biological father in July of 2020 until the time James requested visitation in late November 2020, more than 90 days had passed. Pursuant to the statutory definition of abandonment, the trial court's findings technically were supported by the evidence.

**{¶39}** Finally, James argues that the termination of his parental rights was against the manifest weight of the evidence. Despite the evidence of what happened and did not happen in this case, the evidence is clear that J.A. was adjudicated as a dependent, neglected, and abused child on May 23, 2019. The motion for permanent custody was filed on February 1, 2021. J.A. was therefore in the temporary custody for more than 20 months of a consecutive 22 month period. Parental rights of a parent may be terminated if the child is in the custody of the Agency for 12 out of a consecutive 22 month period. R.C. 2151.414(B)(1)(d). The rights may also be terminated if the child is determined to be an abandoned child, which J.A. technically was, as discussed above. Although James' assignment of error raise valid questions and some of the trial court's specific findings were not supported by the evidence, other findings were supported. As long as one of the listed conditions is met, the trial court's judgment as a whole terminating the parental rights of James was not against the manifest weight of the evidence. For this reason, James' six assignments of error are overruled.

*Best Interest of the Child*

**{¶40}** Brandy claims in her second assignment of error that the trial court's decision to grant the Agency's motion for permanent custody was not in the best interest of J.A.[7] "Once a trial court has determined that one of the enumerated

---

[7] James did not raise this issue as an assignment of error.

provisions in R.C. 2151.414(B)(1) applies, it then must determine by clear and convincing evidence whether granting the agency permanent custody of the child is in the child's best interest." *In re A.N.*, 3d Dist. Marion No. 9-19-79, 2020-Ohio-3322, ¶ 5.

> **(D)(1) In determining the best interest of a child at a hearing held pursuant to division (A) of this section \* \* \* the court shall consider all relevant factors, including, but not limited to, the following.**
>
> **(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**
>
> **(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**
>
> **(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies \* \* \* for twelve or more months of a consecutive twenty-two month period \* \* \*.**
>
> **(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.**
>
> **(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

R.C. 2151.414(D). A trial court must either specifically address each of the required factors or otherwise provide some affirmative indication that it considered the listed factors. *A.N. supra.*

{¶41} Here the trial court specifically discussed each factor set forth in R.C. 2151.414(D). The trial court noted that J.A. was more attached to the foster parents than either of his biological parents, that his behavior indicated he wished to stay with the foster family, that he had been in the care of the Agency for the majority of his life, and that J.A. needed to be in a legally secure permanent placement. Doc. 149. All of the findings identified evidence in support of them. Thus, there is competent, credible evidence to support these findings by clear and convincing evidence as they apply to Brandy. Brandy's second assignment of error is overruled.

{¶42} Having found no errors prejudicial to either appellant in the particulars assigned and argued, the judgment of the Court of Common Pleas of Hancock County, Juvenile Division, is affirmed.

*Judgment Affirmed*

**ZIMMERMAN, P.J. and SHAW, J., concur.**

**/hls**